## In re PROCTOR'S WILL.

(Surrogate's Court, Ontario County. December 28, 1910.)

WILLS (§ 55*)—TESTATOR'S MENTAL CAPACITY—EVIDENCE—SUFFICIENCY.

    Evidence *held* insufficient to show that testator had sufficient mental capacity to fully understand the nature and extent of his property, the natural objects of his bounty, and the effect of his will.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. § 137–161; Dec. Dig. § 55.*]

In the matter of the probate of George W. Proctor's will. Probate denied.

Nathan D. Lapham, for Ella Proctor.
William S. Moore, for First Society of Methodist Episcopal Church.
P. H. Leahy, special guardian.

DITMARS, S. The alleged last will in this matter was executed February 16, 1904, and a codicil thereto on July 12, 1904.

Did George W. Proctor, on these occasions, have sufficient mental capacity to fully understand the nature and extent of his property? Did he appreciate his relationship to those who were naturally the objects of his bounty? Were his mental faculties strong enough so that he could co-ordinately retain this essential knowledge for a sufficient length of time to direct, of his own volition, the disposition of his estate, and did he clearly comprehend the nature and effect of such disposition when he executed the instruments?

The conclusion as to these propositions must be drawn from the hearing of the witnesses, the study of some 3,000 pages of testimony, and 394 closely written pages of brief.

At the time of the death of the testator, he left him surviving his wife and some distant relatives, but no descendants.

The alleged will gives to his wife the life use, and absolutely his entire estate, except that at her death Miss Clara Meyers is to receive a house and lot on Tilman street, and the First Society of the Methodist Episcopal Church is to have $1,000. In the event that his wife predeceased him, then the entire residue is to go to the said church. Since 1901 he was a member and a regular attendant of this church, and was also a distant relative of the mother, and a friend of Miss Meyers. Therefore the alleged will, prima facie, is not an unnatural one, nor an unjust one, unless it differs from all his previous de-

<hr>

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

clared intentions. It does differ from the alleged will of March 12, 1888, which is also offered for probate, in respect to these provisions which take effect after the death of his wife. The will of March 12, 1888, leaves everything to Mrs. Proctor, absolutely. Numerous witnesses testify that he stated to them that "Ella," his wife, should have everything, while there is no evidence whatever that he had ever declared any intention of leaving anything to either Miss Meyers or to the church, except it be to the scrivener of the will and codicil, or to his attorneys.

We find that, prior to his becoming afflicted with the disease which caused his death, he was a strong, active, shrewd, self-reliant business man—quiet and reserved as to his business affairs. He had been industrious, and, with the aid of his wife, had accumulated an estate worth from $8,000 to $10,000. During the latter part of the nineties, he began to break down, mentally and physically, and in 1900 we find him at Mt. Clemens for a period of some three months, taking treatment. At least a portion of this time while there, he was unable to write an intelligent letter, for he gets some one to write for him, and at the close of one of the letters, in evidence, he writes the meaningless words, "all to all." On his return, he expresses himself as being better, and again takes up his business—that of farming, teaming, trucking, etc. He continues along for a time, but neither his mind nor his physical strength is able to endure in anything like a normal condition. The disease is in the brain. It is progressive. He complains of headache and sleeplessness. The motor and sensory centers of speech become affected. He stammers, hesitates, omits words, repeats, changes subjects without finishing any particular topic. Then other brain centers become affected. His mind weakens and fails. He becomes forgetful, loses will power, the process of reasoning, and this goes on, more or less rapidly, until, in the fall of 1905, he loses the power of speech, wanders about aimlessly, and practically all of the intellectual brain centers have degenerated, and we find him dying in convulsions on the 16th day of March, 1906.

The disease is manifest to the lay witnesses in all sorts of irrational ways; his looks, his actions, his speech, and his silly grin. As early as 1901 his wife began to care for the business, keeping an account of the work, and in this year he lost his way while driving home from some place on South Main street. In 1902, his impairment of speech and articulation became more manifest. His forgetfulness also is evidenced by his leaving the ladies at the farm; engaging board for the threshers, and not knowing he had done so; and getting his accounts for rent mixed up, etc. He would laugh when there was no occasion for it, put his horses into the field of oats, hitch them up wrong, and insisted on his newsdealer delivering a daily paper to the farm, two miles away, so that he could see it drop into the mail box, and see the little flag bob up and down. In October of this year, he moved in the house on the farm, evidently in the hope that the change might be beneficial, and he lived there for a year; but he grew worse instead of better. His neighbors, one or two of his workmen, the guests at the house, and many other witnesses tell of irra-

tional acts and incoherent and unintelligible talk that leave no doubt as to his inability to transact business of his own volition, and in the exercise of his own judgment. After he moves back to the city, the manifestations become more and more pronounced. The neighbors and tradespeople, his tenants, some 50 witnesses, tell of his innumerable acts. He has apoplectiform seizures. His wife has to care for him and watch him. He is unable to do scarcely any work, unable to make change correctly, or properly care for his money. His tenants pay their rent to Mrs. Proctor, and look to her for repairs. He begins to pick up all sorts of trash on the street and from other places and carry it into the house, or the places of business where he frequented.

Now, there was a sale of two or three horses, other than the auction sale, two or three mortgages were taken; a monument purchased, one or two loans made, and some other business matters transacted, during the period from October, 1902, to about August, 1904, which have been sworn to by witnesses called by either the proponent or the contestant; the proponent to show that Mr. Proctor actually transacted the business intelligently and in the exercise of good judgment, and the contestant to show that Mrs. Proctor directed and consummated these matters. As these are matters of absolute importance in the determination of this contest, I have given them most careful consideration, and find that in nearly every instance Mrs. Proctor participated, and that it was her judgment and her direction that was followed, and not that of Mr. Proctor; that while she did not go to the office of the attorneys who prepared the papers and attended to their execution and the details, nevertheless, she was the controlling spirit. When his attorney went with him on some business matters, it is fair to assume that the attorney did most of the talking, and looked after the business in hand. In the payment of taxes, and one or two other matters which Mr. Proctor apparently attended to during this time, we can see the guiding hand of Mrs. Proctor. It is shown that she humored him, and let him have money to pay certain bills with, and to make certain purchases. She looked after him, and directed him much as a mother would a weak-minded child. It appears that he received certain collections, but in almost every instance Mrs. Proctor knew of it, or soon learned.

In his attendance at church services, Mrs. Proctor got him ready, put his contribution in the envelope, and wrote his name thereon. He seemed to enjoy attendance at church, was orderly and quiet until some time in 1905; but the testimony shows a grave doubt as to whether he sufficiently understood and appreciated the services so as to be governed by them. The scrivener of the will and codicil had been his attorney for some years. He was attorney for Miss Meyers, and a financial officer of the church. He suggested to Mr. Proctor the giving of a bequest to the church, but not the amount. This, of itself, is not undue influence, and is perfectly proper, unless, perchance, the testator was in such mental condition that he was overpowered by the mere suggestion. They had on previous occasions talked about the preparation of a will, and of devising the house and lot to Miss

Meyers; but nothing before had been said about a bequest to the church. He considered the testator competent to make and execute a will, and in this belief he is perfectly sincere, and acted in the utmost good faith; but he did not see the testator, nor meet him daily, as the numerous witnesses did, nor did he consult with the attending physicians as to his mental condition.

The testator was treated by one of our most reputable physicians at more or less irregular intervals from 1898 or 1899, to November 24, 1904, at which time the testator was unable to write his name. And this physician tells us of the disease, its progress, its effect, of the mental degeneration, and states as his opinion that it would be impossible for Mr. Proctor to direct the preparation and execution of a valid will and codicil at this time. Another physician treated the testator during the year 1903, and gives the same opinion, and very convincing reasons therefor. Still another physician treated him from the winter of 1903 until his death, and is of the same opinion. Another physician, from out of the city, had occasion to examine him in 1904, and is also of the same opinion. They say, in substance, that he could not have clearly and full comprehended the nature and extent of his property, nor the provisions of a will, nor the objects of his bounty; and, in view of these and all the other facts in this case, how can the court find otherwise?

My conclusions are in accord with the attending physicians, and, considering all the testimony, I can reach no other. It follows, therefore, that the probate of the alleged will and codicil must be denied, and the will of July 12, 1888, admitted.

A decree may be entered accordingly.

The attorneys may meet on Saturday, December 31st, at 10 a. m., and arrange further terms of the decree.